IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 21,2009

**STATE OF TENNESSEE v. SEDRIC LAMONT HOLT**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-B-1043      Steve R. Dozier, Judge**

**No. M2008-02052-CCA-R3-CD - Filed July 23, 2010**

A Davidson County Grand Jury returned an indictment against Defendant, Sedric Holt, for nine counts of aggravated robbery. Defendant subsequently pled guilty to five counts of robbery, all Class C felonies. The trial court sentenced Defendant as a Range I, standard offender, to five years each in counts two, three, seven, and eight, and four years in count four. Counts two and three were ordered to be served concurrently with each other and consecutively to count four. Counts seven and eight were ordered to be served concurrently with each other and consecutively to counts two, three, and four for an effective fourteen-year sentence in the Department of Correction. On appeal, Defendant argues that his sentence is excessive and that he should have been granted an alternative sentence. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Ashley Preston, Nashville, Tennessee, for the appellant, Sedric Lamont Holt.

Robert J. Cooper, Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; Pamela Anderson, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

Initially, we note that the transcript of the guilty plea acceptance hearing is not included in the record on appeal. This Court has observed that "a transcript of the guilty plea hearing is often (if not always) needed in order to conduct a proper review of the sentence imposed." *See State v. Keen*, 996 S.W.2d 842, 844 (Tenn. Crim. App. 1999). "Therefore, the facts surrounding Defendants' convictions may only be gleaned from the presentence report and the testimony presented at the sentencing hearing." *State v. Jospeh Scott Tayes*, No. M2008-01101-CCA-R3-CD, 2009 WL 3673053 (Tenn. Crim. App. Nov. 4, 2009)(app. denied April 14, 2010). The presentence report contains an "Official version" of the following facts underlying the charges in this case:

> THE FOLLOWING WAS TAKEN FROM A SUMMARY OF EVENTS POLICE REPORT FOUND IN THE DISTRICT ATTORNEY'S CRIMINAL BLUE FILE. BETWEEN DECEMBER 2006 AMD JANUARY 2007 THERE WAS A SERIES OF ROBBERIES THAT OCCURRED IN NASHVILLE, DAVIDSON COUNTY. THE SUSPECTS WERE DESCRIBED AS MALE BLACKS. THE METHOD OF OPERATION WAS THAT THE SUSPECT USED HANDGUNS AND CHEMICAL SPRAY. MOST OF THE ROBBERIES WERE COMMITED [SIC] AGAINST PERSONS OF ASIAN DESCENT. THE SUSPECTS WOULD SPRAY THE VICTIMS IN THE FACE WITH CHEMICAL SPRAY TO CONCEAL THEIR IDENTITY. ON 12/26/06 AT APPROXIMATELY 6:20 P.M., TWO MALE BLACK SUBJECTS ENTERED THE HOUSE OF CHOY LOCATED AT 3825 DICKERSON PIKE. THE SUSPECTS WERE ARMED WITH HANDGUNS AND CHEMICAL SPRAY. THE SUSPECTS SPRAYED THE VICTIMS WITH CHEMICAL SPRAY. THE SUSPECTS TOOK PROPERTY FROM THE BUSINESS AS WELL AS PROPERTY FROM THE TWO VICTIMS. THE SUSPECTS ALSO TOOK A 1998 GREEN 2 DOOR HONDA CIVIC. THE VICTIMS REPORTED A LARGE AMOUNT OF MONEY TAKEN IN EXCESS OF $8,000.00
>
> ON 01/12/2007 AT APPROXIMATELY 7:15 P.M., A MALE BLACK SUBJECT AND A FEMALE SUBJECT ENTERED ANGEL NAILS LOCATED AT 450 DONELSON PIKE. THE MALE BLACK SUSPECT USED CHEMICAL SPRAY ON THE VICTIM AND THEN TOOK PROPERTY FROM THE BUSINESS. THE PROPERTY WAS U.S. CURRENCY BELIEVED TO BE APPROXIMATELY $500.00. THE BLACK MALE SUSPECT AND THE BLACK FEMALE SUSPECT RAN OUT OF THE BUSINESS TOGETHER.

ON 01/20/2007 AT APPROXIMATELY 6:16 P.M., TWO MALE BLACK SUBJECTS ENTERED THE JACKSON HEWITT TAX SERVICE LOCATED AT 922 MAIN STREET. THE SUSPECTS WERE ARMED WITH A HANDGUN AND CHEMICAL SPRAY. THE SUSPECTS USED CHEMICAL SPRAY ON THE VICTIMS AND TOOK PROPERTY TO INCLUDE A BLACK POCKETBOOK AND CELLPHONES. THE SUSPECTS LEFT THE BUSINESS. ON 01/20/2007 AT APPROXIMATELY 9:20 P.M., TWO BLACK MALE SUSPECTS ENTERED THE CHINA BUFFET LOCATED AT 5336 CHARLOTTE PIKE. THE SUSPECTS WERE ARMED WITH A HANDGUN AND CHEMICAL SPRAY. THE SUSPECTS SPRAYED THE VICTIM AND TOOK PROPERTY FROM THE BUSINESS. THE PROPERTY WAS U.S. CURRENCY BELIEVED TO BE $500.00. THE SUSPECTS WERE SEEN LEAVING IN A BLACK PONTIAC AZTEC WITH TEMPORARY TAGS.

THE DESCRIPTION OF THE SUSPECTS ON THE ABOVE ROBBERY CASES WERE VERY SIMILAR IN RELATION TO HEIGHT AND WEIGHT.

ON 01/03/2007 THE VEHICLE THAT WAS TAKEN IN THE HOUSE OF CHOY ROBBERY (GREEN 2 DOOR HONDA CIVIC) WAS RECOVERED AT CLAIBORNE AND LAFAYETTE STREET. THE VEHICLE WAS FOUND RUNNING WITH THE DRIVER DOOR OPEN. THERE WAS NO MONEY FOUND IN THE VEHICLE.

ON 01/04/07 A CELL PHONE WAS FOUND IN THE VEHICLE THAT DID NOT BELONG TO MR. AND MRS. CHOY. AN INVESTIGATION WAS CONDUCTED AS TO THE OWNER OF THE PHONE AND THE PHONE BELONGED TO A DONSLERAY BRADY. SHE STATED THAT THE PHONE WAS HERS AND THAT THE FATHER OF HER BABY HAD BEEN USING IT.

ON 01/17/07, DETECTIVES TALKED TO ANTHONY LAMPKINS. ANTHONY WAS QUESTIONED ABOUT THE CELL PHONE AND THE RECOVERED STOLEN VEHICLE. HE STATED THAT HE HAD GOT THE VEHICLE FROM A PERSON NAMED ERIC HOLT. HE STATED THAT ERIC HOLT GOES TO MAPLEWOOD AND IDENTIFIED HIM FROM A STUDENT I.D. PICTURE.

ON 01/19/07 ERIC HOLT WAS INTERVIEWED AT MAPLEWOOD HIGH SCHOOL. HE WAS QUESTIONED ABOUT THE STOLEN GREEN HONDA CIVIC. ERIC STATED THAT HE HAD GOTTEN THE VEHICLE FROM A PERSON NAMED RUSSELL AND ANOTHER PERSON NAMED SEDRIC LAMONT HOLT. HE STATED THAT THEY ROBBED SOME CHINESE PEOPLE AND TOOK THEIR VEHICLE. ERIC STATED THAT THEY BOTH STAY AT 1017 EDGEHILL AVENUE. HE STATED THAT THEY COUNTED OUT $17,557.00 IN CASH OUT ON THE BED. ERIC STATED THAT HE SAW A DRIVER [SIC] LICENSE CREDIT CARD. ERIC STATED THAT THEY WENT TO HICKORY HOLLOW MALL WENT SHOPPING. ERIC STATED THAT THEY TOLD HIM THAT THEY USED PEPPER SPRAY WHEN THEY ROBBED THE CHINESE PEOPLE.

ERIC STATED THE NEXT DAY THAT RUSSELL AND OTHERS WENT AND BOUGHT A BLACK TRUCK (AZTEC) WITH PROCEEDS FROM THE ROBBERY. HE STATED THAT THEY BOUGHT THE AZTEC ON CHARLOTTE AVENUE. ERIC STATED THAT RUSSELL HAS TIES TO THE 5 DUEVE HOOVER GANGSTA CRIPS THAT HE STARTED A SMALLER GROUP CALLED THE "CRIME BOSS FAMILY." RUSSELL ALONG WITH OTHERS HAVE TATTOOS INDICATING THAT THEY BELONG TO THE "CRIME BOSS FAMILY." ERIC ALSO INDICATED THAT RUSSELL HAD A LINCOLN CONTINENTAL THAT IS BLACK AND MAROON IN COLOR.

ON 01/19/07 DETECTIVES DROVE BY 1017 EDGEHILL AVENUE AND OBSERVED A BLACK PONTIAC AZTEC AND A BLACK AND MAROON LINCOLN CONTINENTAL. BOTH VEHICLES HAD TEMPORARY TAGS. DETECTIVE WENT TO THE CHARLOTTE PARK AREA TO CHECK WITH CAR DEALERSHIPS TO SEE IF ANYONE HAD PURCHASED A BLACK PONTIAC AZTEC. DETECTIVE CHECK [SIC] WITH CHARLOTTE AVE AUTO SALES AT 3718 CHARLOTTE AVENUE. THE MANAGER ADVISED DETECTIVE THAT A CAR FITTING THAT DESCRIPTION WAS SOLD TO A PERSON NAMED RUSSELL HAMBLIN. ON 01/24/2007 DETECTIVES RE-INTERVIEWED ERIC HOLT. ERIC STATED THAT SEDRIC HOLT WENT TO WHITES CREEK HIGH SCHOOL AND ALSO PEARL COHN. DETECTIVES WENT TO WHITES CREEK HIGH SCHOOL AND FOUND THAT THERE WERE NO PICTURES ON FILE FOR SEDRIC HOLT. DETECTIVES CALLED GALLATIN HIGH SCHOOL AND FOUND WHERE SEDRIC

HOLT HAD A PICTURE ON FILE. THIS PICTURE WAS SENT AND A PHOTO LINE-UP WAS CREATED.

ON 01/25/07 A PHOTO LINE-UP WAS SHOWN TO MR. MICHEAL CHOY. MR. CHOY IDENTIFIED SEDRIC HOLT AS ONE OF THE SUSPECTS THAT ROBBED HIM ON 12/26/06. A WARRANT WAS OBTAINED ON SEDRIC HOLT FOR AGGRAVATED ROBBERY ON 01/25/07 MEMBERS OF THE METROPOLITAN NASHVILLE POLICE DEPARTMENT CONDUCTED SURVEILLANCE AT 1017 EDGEHILL AVENUE. THE BLACK PONTIAC AZTEC WAS OBSERVED LEAVING THE RESIDENCE. IT WAS STOPPED AT 11TH AVENUE NORTH AND JO JOHNSTON AVENUE. KATHERINE HOLT WAS DRIVING AND CARRIE HOLT WAS ON THE PASSENGER SIDE. KATHERINE HOLT STATED THAT SHE DI D NOT HAVE A VALID DRIVERS LICENSE. KATHERINE AND CARRIE HOLT CAME TO THE NORTH PRECINCT AND WERE INTERVIEWED. THE BLACK PONTIAC AZTEC WAS TOWED TO THE METRO IMPOUND LOT.

KATHERINE HOLT WAS INTERVIEWED. SHE STATED THAT THE BLACK PONTIAC BELONGS TO DAVIDA HOLT AND THAT RUSSELL HAMBLIN IS HER BOYFRIEND. SHE STATED THAT ON THE NIGHT IN QUESTION (12/26/06), DAVIDA, CARRIE, SEDRIC, RUSSELL, AND ERIC WENT SHOPPING AT THE HICKORY HOLLOW MALL. SHE STATED THAT SHE OVERHEARD RUSSELL AND SEDRIC SAY THAT THEY STRUCK IT BIG AND WANTED TO GO SHOPPING. KATHERINE HAS A TATTOO ON HER NECK WITH THE LETTERS "CBF" INDICATING THAT IT STOOD FOR "CRIME BOSS FAMILY." KATHERINE IDENTIFIED HER SON FROM THE PICTURE THAT WAS SHOWN AND ALSO ANOTHER VIDEO SURVEILLANCE PHOTO INVOLVING ANGELS NAILS.

CARRIE HOLT WAS INTERVIEWED. SHE STATED THAT ON 12/26/06 SHE WAS PRESENT WHEN RUSSELL AND OTHERS COUNTED MONEY OUT ON THE BED. SHE STATED THAT IT WAS THOUSANDS OF DOLLARS. SHE ALSO STATED THAT THEY WENT SHOPPING ON 12/26/06 AT THE HICKORY HOLLOW MALL. CARRIE STATES RUSSELL HAMBLIN AND SEDRIC HOLT HAVE BEEN ROBBING CHINESE PEOPLE BECAUSE THEY HAVE MONEY. SHE ALSO STATED THAT THEY TOLD HER IF THE VICTIMS DID NOT COOPERATE THEY WOULD MACE THEM. SHE ALSO STATED THAT

THEY HAD MENTIONED A CHINESE RESTAURANT, A CHECK CASHING PLACE, AND AN INSURANCE PLACE. SHE STATED THAT THEY HAVE WEAPONS, INCLUDING SEMI AUTOMATICS, RIFLES, SHOTGUNS AND REVOLVERS.

ON 01/26/2007 SEDRIC HOLT CAME TO THE NORTH PRECINCT AND TALKED TO DETECTIVES. HE WAS PLACED UNDER ARREST AND MIRANDIZED. HE ADMITTED TO ROBBING THE FOLLOWING BUSINESSES: HOUSE OF CHOY, ANGEL NAILS, JACKSON HEWITT, AND CHINA BUFFET. HE WENT INTO DETAIL AS TO HIS INVOLVEMENT IN THE ROBBERIES AS WELL AS IMPLICATING OTHERS. HE IMPLICATED RUSSELL HAMBLIN IN ALL THE ROBBERIES. HE STATED THAT RUSSELL WENT IN WITH HIM AT THE HOUSE OF CHOY. HE STATED THAT THERE WAS A LARGE AMOUNT OF MONEY TAKEN. SEDRIC STATED THAT AFTER THE ROBBERY RUSSELL WENT TO A CAR LOT ON CHARLOTTE AVENUE AND USED THE PROCEEDS FROM THE HOUSE OF CHOY TO BUY A BLACK PONTIAC AZTEC. SEDRIC STATED THAT RUSSELL DROVE ON THE ON THE [SIC] OTHER ROBBERIES.

ON 01/26/07 DETECTIVES WERE ADVISED THAT RUSSELL HAMBLIN HAD BEEN DETAINED AT 1017 EDGEHILL AVENUE. RUSSELL HAMBLIN AGREED TO TALK TO DETECTIVES AND WAS TAKEN TO THE NORTH PRECINCT. RUSSELL HAMBLIN DENIED ANY INVOLVEMENT OF ANY ROBBERIES. HE WAS ASKED ABOUT HOW HE PAID FROM THE VEHICLES THAT HE PURCHASED AND HE STATED THAT HE PURCHASED THEM FOR ILLEGAL DRUG SALES. HE STATED THAT HE DID NOT HAVE A JOB. HE WAS ASKED ABOUT BEING ON PROBATION. HE STATED THAT HE WAS ON PROBATION AND THAT HE THOUGHT HE HAD BEEN REVOKED BECAUSE HE HAD CAUGHT A CHARGE FOR DRIVING ON A SUSPENDED DRIVERS LICENSE. MR. HAMBLIN STATED THAT HE WAS ON PROBATION FOR ROBBERY. MR. HAMBLIN WAS TOLD THAT HE HAD NO OUTSTANDING WARRANTS ON HIM AND HE WAS FREE TO GO ON 01/31/07. DAVIDA HOLT, THE GIRLFRIEND OF RUSSELL HAMBLIN WAS ARRESTED ON AN OUTSTANDING WARRANT FOR THE ROBBERY OF ANGEL NAILS. SHE WAS IDENTIFIED AS THE FEMALE THAT WAS WITH SEDRIC HOLT WHEN THE BUSINESS WAS ROBBED.

ON 02/01/07 RUSSELL HAMBLIN WAS ARRESTED FOR DRIVING ON A SUSPENDED DRIVERS LICENSE.

RUSSELL HAMBLIN'S PROBATION OFFICER WAS NOTIFIED ABOUT RUSSELL HAMBLIN'S ARREST, AND A PROBATION VIOLATION WARRANT WAS ISSUED. ON 02/23/07 RUSSELL HAMBLIN WAS ARRESTED AT 6116 NEW YORK AVENUE APARTMENT C. HE WAS BROUGHT TO THE NORTH PRECINCT AND INTERVIEWED. HE DENIED ANY INVOLVEMENT IN THE ROBBERIES. HE STATED THAT HE HAD BEEN STAYING AT 55 SOUTH 6TH STREET WITH HIS BABY'S MOTHER.

ON 02/23/07 DAVIDA HOLT WAS INTERVIEWED AT THE NORTH PRECINCT. SHE GAVE A STATEMENT. SHE STATED THAT SHE WAS PRESENT THE NIGHT WHEN THE MONEY WAS COUNTED OUT AT 1017 EDGEHILL AVENUE, SHE STATED THAT THEY HAD PARKED THE GREEN CAR DOWN THE ROAD FROM WHERE THEY WERE STAYING. SHE STATED THAT SHE SAW CREDIT CARDS AND IDENTIFICATIONS BELONGING TO CHINESE PEOPLE. SHE STATED THAT SEDRIC HAD A GUN. SHE STATED THAT THE AMOUNT THAT WAS COUNTED WAS $17,000.00. DAVIDA SAID THAT AFTER THEY COUNTED ALL THE MONEY ALL OF THE OTHER ITEMS WERE THROWN IN THE DUMPSTER. RUSSELL TOLD HER THAT HE SPRAYED THE MALE CHINESE VICTIM WITH MACE AND TOLD SEDRIC TO GET THE KEYS OUT OF THE VICTIMS POCKET. SHE ALSO SAID THAT RUSSELL ARRIVED AT THE APARTMENT FIRST AND HE KEPT LOOKING OUT OF THE WINDOW WONDERING WHERE SEDRIC WAS. DAVIDA SAID THAT SEDRIC CALLED RUSSELL TWO DIFFERENT TIMES FROM PAYPHONES BECAUSE HE WAS LOST. HE WAS WANTING TO "DITCH" THE STOLEN CAR, BUT RUSSELL YELLED AT HIM TO STICK WITH THE PLAN AND COME TO THE APARTMENT.

DAVIDA STATED THAT SHE WENT SHOPPING WITH THEM THAT NIGHT. SHE STATED THAT THE NEXT DAY RUSSELL HAMBLIN AND OTHERS WENT TO CHARLOTTE AVENUE AND PURCHASED A BLACK PONTIAC AZTEC. SHE ALSO STATED THAT THEY WENT TO WALMART AND PURCHASED A LARGE SAFE. SHE STATED THAT THE SAFE WAS PURCHASED AT WALMART ON NOLENSVILLE ROAD. DAVIDA STATED THAT THE SAFE WAS TAKEN TO 550

SOUTH 6TH STREET. DAVIDA SAID TAT RUSSELL WENT TO SUPER D'S NIGHTCLUB THE WEEKEND OF THE ROBBERY AND HE WAS BUYING DRINKS AND FLASHING SO MUCH MONEY THAT THE OWNER TOLD HIM THAT HE BETTER PUT HIS MONEY AWAY. IN AN INTERVIEW, HAMBLIN TALKED ABOUT BEING AT SUPER D'S NIGHTCLUB. WHEN RUSSELL HAMBLIN WAS ARRESTED A PIECE OF PAPER WAS FOUND WITH INFORMATION ABOUT THE "CRIME BOSS FAMILY." ONE OF THE NOTATIONS SAID THAT WAYNE HOLT HAD BEEN DROPPED AS A MEMBER. DAVID WAS ASKED ABOUT THIS AND SHE SAID THAT WAYNE IS ERIC HOLT. RUSSELL HAD HEARD THAT HE HAD TALKED TO THE POLICE, SO HE WAS NO LONGER A MEMBER OF THE "CRIME BOSS FAMILY." ANOTHER NOTATION SAID THAT THE "CRIME BOSS FAMILY" WAS FIRST NOTICED BY AUTHORITIES ON 01/26/07 AND IT ALSO SAID THAT ONE OF THE MOST HATED THINGS WERE THE POLICE. ACCORDING TO THE PAPER THE GROUP WAS STARTED NOVEMBER 2006.

ON OR ABOUT 02/16/07 DAVIDA STATED THAT SHE OBSERVED THIS SAFE AT 550 SOUTH 6TH STREET. SHE STATED THAT RUSSELL TOLD HER THE REASON HE BOUGHT THE SAFE WAS TO KEEP THE MONEY IN THE SAFE AND TO KEEP THE OTHER PEOPLE HE ASSOCIATED WITH FROM STEALING IT FROM HIM. DAVIDA ALSO STATED THAT THE SAFE WAS BOUGHT WITH PROCEEDS FROM THE HOUSE OF CHOY ROBBERY.

ON OR ABOUT 02/21/07 DAVIDA STATED THAT RUSSELL TOLD HER THAT HE THOUGHT HIS BABY'S MOTHER, SHARDEA TAYLOR HAD BEEN STEALING MONEY FROM HIS SAFE.

BASED ON THE TOTALITY OF THE CIRCUMSTANCES IT IS BELIEVED THAT RUSSELL HAMBLIN HAS BEEN INVOLVED IN CRIMINAL ACTIVITY INCLUDING AGGRAVATED ROBBERY AND ILLEGAL DRUG SALES.

THE METHOD OF OPERATION OF THE ROBBERIES ARE VERY SIMILAR WHERE THE SUSPECTS USED MACE AND A HAND GUN. THE SUSPECTS USUALLY TARGETED PERSONS OF ASIAN DESCENT. WITNESSES HAVE GIVEN STATEMENTS IMPLICATING RUSSELL HAMBLIN AND OTHERS IN CRIMINAL ACTIVITY

INCLUDING AGGRAVATED ROBBERY. RUSSELL HAMBLIN HAS ADMITTED TO SELLING ILLEGAL DRUGS AND USING [SIC] THE AGGRAVATED ROBBERY. RUSSELL HAMBLIN HAS ADMITTED THAT HE HAS NO OTHER MEANS OF INCOME FROM A LEGITIMATE WORK PLACE. INFORMATION WAS RECEIVED THAT A SAFE WAS PURCHASED TO CONCEAL PROCEEDS FROM CRIMINAL ACTIVITY SUCH AS AGGRAVATED ROBBERY AND ILLEGAL DRUG SALES. RUSSELL HAMBLIN HAS ADMITTED THAT HE IS A GANG MEMBER.

ON 02/03/07, A SEARCH WARRANT WAS EXECUTED AT 550 SOUTH 6th STREET. MEMBERS OF THE METROPOLITAN NASHVILLE POLICE DEPARTMENT ANNOUNCED THEIR PRESENCE AND KNOCKED ON THE DOOR. IT WAS ANNOUNCED THAT POLICE WERE PRESENT AND THAT A SEARCH WARRANT WAS TO BE SERVED. SEVERAL MINUTES WENT BY BEFORE ENTRY WAS MADE. THE APARTMENT WAS CLEARED AND A SAFE WAS FOUND UPSTAIRS IN A BEDROOM CLOSET. PAPERS WERE FOUND AT THE APARTMENT INDICATING THAT RUSSELL HAMBLIN WAS RECEIVING MAIL AT 550 SOUTH 6TH STREET. THE SAFE WAS PRINTED AND PHOTOGRAPHED. THE SAFE WAS OPENED AND NOTHING WAS FOUND. THE SAFE WAS IN AN UPSTAIRS CLOSET, WHICH IS EXACTLY WHERE DAVIDA HOLT SAID IT WOULD BE.

SHARDEA TAYLOR ARRIVED AT 550 SOUTH 6TH STREET AND INQUIRED ABOUT ENTRY INTO HER APARTMENT. SHE WAS ADVISED THAT A SEARCH WARRANT WAS EXECUTED AND THAT NO ONE ANSWERED THE DOOR AND ENTRY WAS MADE. DETECTIVES TALKED TO HER ABOUT RUSSELL HAMBLIN. SHE STATED THAT RUSSELL HAMBLIN IS THE FATHER TO AT LEAST ONE OF HER CHILDREN. SHE STATED THAT HE HAS NOT BEEN THERE IN ABOUT A WEEK. DETECTIVES ASKED ABOUT THE SAFE AND SHE STATED THAT RUSSELL BROUGHT THE SAFE OVER TO HER APARTMENT ABOUT THE SAME TIME HER CHILD WAS BORN. HER CHILD WAS BORN ON OR ABOUT 12/31/06. SHE WAS ASKED WHY HE BROUGHT IT OVER AND SHE STATED THAT SHE DID NOT KNOW.

DETECTIVES ASKED HER IF SHE WAS FAMILIAR WITH DAVIDA HOLT AND SHE STATED THAT SHE KNEW HER BUT DID NOT HAVE ANYTHING TO DO WITH HER. DETECTIVES NOTICED THAT THE

VEHICLE SHARDEA AND HER BROTHER ARRIVED IN. THE VEHICLE THEY WERE DRIVING BELONGED TO DAVIDA HOLT. DETECTIVES ASKED STEVEN HOW HE KNEW DAVIDA AND HE STATED THAT SHE WAS A FRIEND AND THAT SHE WAS RENTING AN APARTMENT FROM HIM AT 6116 NEW YORK AVENUE. STEVEN ALSO STATED THAT HE WAS FAMILIAR WITH RUSSELL HAMBLIN. HE STATED THAT HE CAUGHT A GUN CHARGE WHILE BEING ASSOCIATED WITH HIM BASED ON THE REPORTS, WITNESS STATEMENTS, AND CONFESSIONS, IT IS BELIEVED THAT RUSSELL LENOX HAMBLIN AND SEDRIC LAMONT HOLT ROBBED THE HOUSE OF CHOY AT 3825 DICKERSON PIKE. SEDRIC ADMITTED TO HIS INVOLVEMENT AND IMPLICATED RUSSELL LENOX HAMBLIN.

WITNESSES INCLUDING ERIC HOLT, CARRIE HOLT, KATHERINE HOLT, AND DAVIDA HOLT WERE EITHER PRESENT WHEN MONEY WAS COUNTED FROM THE HOUSE OF CHOY ROBBERY OR HEARD RUSSELL HAMBLIN AND SEDRIC HOLT DISCUSSING ROBBERIES INCLUDING CHINESE RESTAURANTS.

*Sentencing Hearing*

At the sentencing hearing, Donna Osborne testified that she was present during the robbery of the Angel Nail Salon, and she testified at co-defendant Russell Hamblin's trial. Ms. Osborne prepared a victim impact statement and submitted it to the trial court. She also made the following statement:

> . . . I beg of you Judge Dozier, to think about your loved ones, your wife or children that are just going to get their nails done, just run a normal errand. And, the thought of them being present during a robbery and having a gun pointed at one of their heads, not knowing if I was going to die.
>
> All I could think of was my loving husband and I have a - - I had a sixteen year old son at the time. He's older now, of course. You know, I wondered if I would ever get to see my friends and family again or ever see my son's life fulfilled. Uh - - I want everyone in this courtroom to realize that in my opinion this is a poor waste of a human being sitting over there right now.
>
> He has been found guilty . . . said he was guilty of numerous crimes that he and his friends and a family member committed over and over again. He obviously doesn't care about anyone but himself.

I don't want him out free in our society. If he is, the next time he commits a crime, someone might be killed. I'd rather stop a murder now instead of giving Holt another chance to really hurt somebody seriously. You know, robbing people and businesses, hurting innocent people, hurting people physically with punches or hitting them with pistols, you know, that's not all he has done.

He has also hurt emotionally and damaged people, myself for instance. I have lost all confidence in people. Everyone I see I feel is gonna hurt me or hurt my family members.

I've gone through a very bad depression over this. Uh–I've lost my pride, my self-confidence, and sometimes I feel like I've lost my mind because of this whole ordeal.

To you, Cedric [sic] Holt, I pray to God that you go to jail, not just for my sake, but, for society's sake.

I pray to God that you get help. And, I also pray to God that some day you'll realize what you have done and you'll ask for forgiveness because he will forgive you, as I will, too, today. I won't forget you for the rest of my life, but, I'm a big enough person to forgive you.

Detective Russell Thompson, of the Metropolitan Nashville Police Department, testified that his first contact with Defendant was when Defendant turned himself in at the North Police Precinct. He questioned Defendant, who admitted his involvement in the crimes. However, his story about the other participants was "less than truthful." After informing Defendant that they knew the truth about the other participants, Defendant was cooperative and told him the truth. Detective Thompson testified that Defendant gave information that was helpful to the investigation. He felt that Defendant's intelligence was below average. Detective Thompson's opinion was that "Russell Hamblen [sic] was the master mind and that Sedric kind of went along with anything Russell told him." He was not aware that Defendant had any prior criminal history.

Frederick Hillard is employed by Urban Housing Solutions and is the "Director of the Academy." He explained that the Academy is a two-year residential drug rehabilitation program. Mr. Hillard testified that he interviewed Defendant and said that he was a good candidate for the program. He said: "In order for me to go to the jail to interview someone, they must write me a letter stating their interest and the reasons why they want to come to the program. So, by reading this letter and by going to an interview, I think that he is a good

-11-

candidate." Mr. Hillard explained that the Academy is a very strict program, and Defendant would never be alone. He said that the residents work during the day and attend classes in the evening. He also explained that there are consequences for breaking the rules, which includes being "put out" of the program. Mr. Hillard testified that the Academy would transport Defendant to weekly meetings with a Community Corrections Officer.

Defendant said that he testified at Russell Hamblin's trial and told the court about his own involvement in the offenses. He testified that his testimony at trial was true, and the robberies were the idea of Russell Hamblin, who was his sister's boyfriend. Defendant said that he was sorry for his actions; however, he was "just following somebody and just doing it." He also testified that Russell Hamblin had a lot of influence over him. Now that he knows the outcome of things, he realizes that it is not a good idea to follow someone else. Defendant testified that after learning of the warrant for his arrest, he turned himself in and spoke with Detective Thompson. He said that he initially lied about Mr. Hamblin's involvement in the offenses, and he never told Detective Thompson about his sister's involvement because he wanted to protect her. Defendant said that his arrest for the robberies was the first time that he had been arrested for anything. He said that there were threats against him and fights as a result of his testimony at Mr. Hamblin's trial. Because of the threats, Defendant decided not to testify at Mr. Hamblin's upcoming sentence hearing.

Defendant testified that he was eighteen at the time of the offenses, and he attended school until the eleventh grade, taking special education classes. After that he was home schooled because of surgery on his legs. He said that he did not receive any type of GED or diploma, and he is unable to read or write. He also attended several different schools throughout his life because he lived with different people. At one time, he was in state custody because his mother lost custody of him. Defendant testified that he has never had a job, and he has smoked marijuana and used ecstacy pills. He said that he was using drugs at the time of the robberies. Defendant testified that if released into society, his intention was to get his "life back together and stay on the right track." It was his understanding that he had been accepted into the Academy, and he was interested in the program.

On cross-examination, Defendant testified that before he turned himself in, he and Russell Hamblin discussed not using Mr. Hamblin's name and telling police a story about "Tez" being involved in the robberies. Defendant admitted that it was his idea to use the name "Tez."

## II. Standard of Review

As previously stated, Defendant failed to include the transcript of the guilty plea hearing in the record on appeal. It is the duty of the appellant to prepare a record which conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues which form the basis of the appeal. Tenn. R. App P. 24(b); *see also Thompson v. State*, 958 S.W.2d 156, 172 (Tenn.Crim.App.1997). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." *State v. Bibbs*, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991). Notwithstanding Defendant's failure to include this transcript, we will address the issues raised by Defendant.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. *See* T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court form which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correction, however, "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is de novo. *Carter,* 254 S.W.3d at 345 (quoting *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992); *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn. 2004)).

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

Tennessee's sentencing act provides:

(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent,

-13-

career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c)(1)-(2).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the trial court's findings are adequately supported by the record. *Id*. § (d)-(f); *Carter*, 254 S.W.3d at 342-43. "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in . . . the Sentencing Act." *Carter*, 254 S.W.3d at 346. Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and their application was not otherwise barred by statute. *See Id*.

### A. Length of Sentence

Defendant was convicted of five counts of robbery, all Class C felonies. As a Range I offender, he was subject to a sentence of between three and six years for each conviction. The trial court applied the following enhancement factors: the defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense, and the defendant had no hesitation about committing a crime when the risk to human life was high. T.C.A. § 40-35-114 (9) and (10). As a mitigating factor, the trial court considered Defendant's desire for drug treatment and his "allegations of learning difficulties." T.C.A. § 40-35-113 (9). On appeal, Defendant argues that his sentence is excessive because the trial court incorrectly applied the two enhancement factors. He further argues that the trial court should have considered as a mitigating factor that he was acting at the direction of his co-defendant during the robberies and that he gave information to police that was helpful to the investigation.

The record reflects that the trial court considered the evidence presented at the co-defendant's trial, and the sentencing hearing. The court further considered the presentence report, the principles of sentencing and the arguments as to sentencing alternatives, the nature and characteristics of the offenses, the evidence offered by the parties on enhancement and mitigating factors, and the potential for rehabilitation or treatment. The record in this case supports the trial court's finding that Defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the robberies. In its sentencing order, the trial court noted that "[t]he defendant employed a gun in the offense encompassed in Counts two and three." The court further noted that all of the robberies in this case involved the use of a weapon. Likewise, the record supports the trial court's finding that Defendant had no hesitation about committing a crime when the risk to human life was high. In considering the facts of the case, the trial court held:

> The facts of the case were that the Defendant along with three other co-defendants committed a series of robberies, using a firearm and pepper spray as weapons. Counts two and three involved the robbery of House of Choy on December 26, 2006, in which the two victims were sprayed in the face with the chemical spray in the pursuit of the robbery. At the trial of Russell Hamblin, the victim testified a gun was aimed at her as she was forced to lie on the ground. Mr. Choy was also robbed at gunpoint of money. The defendants took several thousand dollars and a vehicle. Count four involved the robbery of Angel Nails on January 12, 2007 in which pepper spray was also used against the victim and a weapon was involved, and approximately five hundred dollars was taken. Counts seven and eight involved the robbery of Jackson Hewitt Tax service on January 20, 2007, in which the defendants were armed with the pepper spray and a weapon. At least one victim was sprayed in the face and defendants took the victims' purse and cell phones.

Donna Osborne was present during the robbery of the Angel Hair Salon. She testified at the sentencing hearing, and she submitted a victim impact statement. As noted by the trial court, Ms. Osborne testified "as to the negative impact the offense has had on her life, including depression." She also indicated to the court that a gun was held to her head during the robbery. Therefore, the trial court properly applied enhancement factors (9) and (10).

As for the mitigating factors, the trial court heard Detective Thompson's testimony, and within its discretion chose not to consider that Defendant was acting at the direction of his co-defendant, and that he gave information that was helpful to the investigation. In fact, the record shows that Defendant initially lied to police about the other participants in the robberies. He and co-defendant Hamblin discussed not using Mr. Hamblin's name and

-15-

telling police a story about "Tez" being involved in the robberies. Defendant admitted that it was his idea to use the name "Tez."

As for Defendant's arguments about the weight assigned by the trial court to the enhancement and mitigating factors, this is no longer grounds for appeal. *Carter*, 254 S.W.3d at 344. The record clearly shows that the trial court followed the statutory sentencing procedure, made findings of facts that are adequately supported in the record, and gave due consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the applicable enhancement factors considered by the trial court adequately support the trial court's discretionary decision to impose a sentence of five years each in counts two, three, seven, and eight, and four years in count four, which are within the statutorily prescribed sentencing range for a Range One standard offender.

### B. Alternative Sentencing

Defendant argues that the trial court erred in not granting him probation. Effective June 7, 2005, our legislature amended Tennessee Code Annotated section 40-35-102(6) by deleting the statutory presumption that a defendant who is convicted of a Class C, D, or E felony, as a mitigated or standard offender, is a favorable candidate for alternative sentencing. Our sentencing law now provides that a defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." T.C.A. § 40-35-102(5), (6). Additionally, a trial court is "not bound" by the advisory sentencing guidelines; rather it "shall consider" them. *Id*. § 40-35-102(6).

No longer, therefore, is any defendant entitled to a presumption that he or she is a favorable candidate for probation. *Carter*, 254 S.W.3d at 347. If a defendant seeks probation, then he or she bears the burden of "establishing suitability." Id. § 40-35-303(b). As the Sentencing Commission points out, "even though probation must be automatically considered as a sentencing option for eligible defendants, the defendant is not automatically entitled to probation as a matter of law." Id. § 40-35-303, Sentencing Comm'n. Cmts.

The following considerations provide guidance regarding what constitutes "evidence to the contrary:"

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1); *see also Carter*, 254 S.W.3d at 347. Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. T.C.A. § 40-35-103(2), (4). The court should also consider the defendant's potential for rehabilitation or treatment in determining the appropriate sentence. *Id*. § 40-35-103(5).

In this case, Defendant was convicted of five Class C felonies. The State argues that Defendant is not eligible for probation because his "total effective sentence is 14 years." However, "a defendant with a total effective sentence in excess of ten years is eligible for probation if the individual sentences imposed for the convictions fall within the probation eligibility requirements." *State v. Arealie Boyd*, No. W2009-00762-CCA-R3-CD, 2010 WL 1240720 (Tenn. Crim. App., Mar. 30, 2010). Therefore, Defendant remains eligible for an alternative sentence because his sentences were each ten years or less, and the offenses for which he was convicted are not specifically excluded by statute. *Id*. §§ 40-35-102(6), -303(a).

In determining Defendant's sentence, the trial court considered Defendant's social history, including testimony about the drug rehabilitation facility that he requested to attend, and evidence that Defendant had been home schooled and in state custody as a minor. The court also noted that records were introduced documenting past educational and juvenile court issues. Concerning alternative sentencing, the trial court held:

The evidence in the case indicated the defendant used a gun and/or pepper spray during the offense. In the robbery involved in Counts two and three, the Defendant utilized a gun and drove the victim's car away from the scene. He then benefitted in the proceeds of all of the robberies. Furthermore, the Defendant received the benefit of a reduced plea based upon the admitted facts. By statute, the defendant is eligible for probation and is seeking alternative sentencing as to each count under the provisions

Notwithstanding the provisions of this statute and case law, the Court is of the opinion that Defendant is not amenable to treatment and/or rehabilitation based

on the violent nature of the offense. Neither probation nor community corrections is appropriate under the violent nature of these offenses. The court is of the opinion that confinement is necessary to avoid depreciating the seriousness of the offense. T.C.A. § 40-35-103.

In considering Defendant's sentence, the trial court also noted that Defendant "is an offender whose record of criminal activity is extensive, as the Defendant was involved in these multiple serious robberies."

The record in this case shows that Defendant was involved in nine aggravated robberies of businesses occurring between December of 2006 and January of 2007. Defendant ultimately pled guilty to five counts of robbery. During the robberies, the Defendant and his co-defendants used a firearm and pepper spray. They sprayed the victims in the face with the chemical spray in order to conceal their identity while they took property from the businesses and the victims. During one of the robberies, the victim's car was also taken. The Supreme Court has held that "where, as in this case, a petitioner has been involved in multiple armed robberies, the factor of deterrence alone is sufficient to justify the trial court's action in denying the petitioner for a suspended sentence." *State v. Hollingsworth*, 647 S.W.2d 937, 939 (Tenn. 1983). In addition to the facts of this case, Defendant, who was eighteen at the time of the offense, testified that he has never had a job, and he has smoked marijuana and used ecstacy pills. Defendant said that he was using drugs at the time of the robberies. This reflects negatively on his potential for rehabilitation.

Based on our review, we conclude that the record amply supports the trial court's denial of Defendant's request for alternative sentencing. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE

-18-